UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

STEPHEN AND ALEXANDRIA SCANLAN,                    PLAINTIFFS
INDIVIDUALLY AND AS ADMINISTRATORS
OF THE ESTATE OF SAWYER SCANLAN

v.                                    CIVIL ACTION NO. 3:12-CV-00009-CRS

SUNBEAM PRODUCTS, INC. D/B/A                       DEFENDANT
JARDEN CONSUMER SOLUTIONS

Memorandum Opinion

I.      Introduction

This wrongful death action follows the tragic death of two-year-old Sawyer Scanlan from

heatstroke.  Alexandria and Stephen Scanlan (the "Plaintiffs") are his surviving parents.  The

Plaintiffs sued Sunbeam Products, Inc., d/b/a Jarden Consumer Solutions ("Sunbeam"), the

manufacturer of a space heater, on behalf of themselves and as administrators of Sawyer's estate.

Sunbeam moves for summary judgment.  Def.'s Mot. Summ. J., ECF No. 81 – 84.

For the reasons below, the Court will grant Sunbeam's motion for summary judgment on

the Plaintiffs' strict liability, negligence, breach of warranty, Kentucky Consumer Protection

Act, and Magnuson-Moss Warranty Act claims.  The Court will also grant Sunbeam's motion for

summary judgment on the Plaintiffs' claim for survival damages.  Additionally, the Court will

grant Sunbeam's motion for summary judgment on the Plaintiffs' claim for punitive damages as

well as their Plaintiffs' negligent infliction of emotional distress claim.

In summary, all claims against Sunbeam will be dismissed with prejudice.

II.     Undisputed facts

1

About a week before Sawyer's death, Stephen bought a Sunbeam Fan-Forced Heater, Model No. SFH111 (the "space heater") at a local store in Louisville for less than $20. Stephen "may have glanced over the instructions," but he could not remember if he "fully read them or not." Stephen Scanlan Dep. 143, ECF No. 81-3. He read the box but only glanced at the instructions because he "knew how to operate an electric space heater." *Id.*

The Holmes Group originally designed and sold the space heater. Sunbeam began manufacturing the space heater after acquiring Holmes in 2008. The space heater is a 1500 watt electric coil space heater with a fan. Holmes designed the space heater for small rooms.

On the top of the space heater, there are two turn dials. The right turn dial is the Mode Control. The Mode Control enables a user to shut off the space heater, switch between "low heat" at 1000 watts and "high heat" at 1500 watts, or turn on the fan-only setting without heat output. Instruction Manual 3, ECF No. 81-8.

The left turn dial is the Thermostat Control.[1] This dial can turn 270 rotational degrees[2] and is marked with 10 progressively larger dots and a picture of a thermometer.

The instruction manual says,

---

[1] Throughout its briefing, Sunbeam refers to the Thermostat Control as the "adjustable comfort thermostat." *See, e.g.*, Def.'s Mem. Supp. Mot. Summ. J. Prods. Liab. 4, ECF No. 81-1. Sunbeam appears to have added the word "comfort" because its expert, Robert Miller, used the term "adjustable comfort thermostat." *See, e.g.*, Miller Aff. ¶ 4, ECF No. 88-20.

However, the instruction manual for this space heater refers to the left turn dial as the "Thermostat Control." Instruction Manual 3. Additionally, the space heater's box uses the term "Adjustable Thermostat" which is an "[e]asy to use control panel allow[ing] temperature changes for maximum comfort." Space Heater Packaging 1, ECF No. 93-13. The Plaintiffs refer to the left turn dial as the "manual reset thermostat" or "thermostat." *See, e.g.*, Pls.' Resp. Opp. Mot. Summ. J. Prods. Liab. 4 – 5, ECF No. 91.

The Court will refer to the left external turn dial visible to the user as the "Thermostat Control." The Court will refer to the space heater's analog thermostat, which is inside the space heater below the Thermostat Control, as the "thermostat."

[2] The Court will refer to the degree to which the Thermostat Control is turned as "rotational degrees." All other "degrees" mentioned are temperature readings in degrees Fahrenheit.

**NOTE**: To start heater operation, make sure the Thermostat Control is turned fully clockwise to the highest position (Largest ●).

**Thermostat Control**

1.      Before setting the thermostat, allow heater to operate and warm up the room.  As noted before, you need to turn the Thermostat Control to the highest setting (Largest ●) to start the heater.
2.      When the desired temperature comfort level is reached, lower the thermostat setting until the fan/heater stops operating.  This is done by moving the Thermostat Control counter-clockwise toward the Low (Smallest •) setting.
3.      The control will now automatically maintain the pre-set temperature level by cycling the heater ON and OFF.

**NOTE**: It is normal for the heater to cycle ON and OFF as it maintains the preset temperature.  To prevent the unit from cycling, you need to raise the thermostat setting.

Instruction Manual 3.  The Thermostat Control "is designed to shut off once a desirable comfort level [is] reached."  Def.'s Resp. Interrog. 33, ECF No. 81-7.  The instruction manual also says,

When using electrical appliances, basic safety precautions should always be followed to reduce the risk of fire, electric shock, and injury to persons, including the following: ...

6.  Extreme caution is necessary when any heater is used by, or near children or invalids, and whenever the heater is left operating and unattended.

Instruction Manual 2.  The instructions provide no explicit warning as to any risk of serious injury or death resulting from exposure to ambient heated air from the space heater.  The space heater itself does not have any warnings.

When the Thermostat Control is at the highest position, at 270 rotational degrees, the thermostat shuts off the unit at 185 degrees.  Prins Mar. Dep. 91, ECF No. 91-9.  The space heater also has a thermal fuse which shuts off the unit at 235 degrees.  *Id.* at 95.  The primary purpose of both the thermostat and the thermal fuse is to prevent the space heater from overheating, which can lead to a shock hazard, burn injury, or fire.  *Id.* at 92 – 95.

On the evening of December 15, 2010, around 9:00 pm, Stephen put Sawyer to bed in his crib.  Stephen Scanlan Dep. 7.  Sawyer slept in a second-floor bedroom of the family's home at

3

2800 Triplett Court in Louisville.  Sawyer had vomited twice that evening: once around 7:15 pm, and another time around 7:30 or 8:30.  *Id.* at 211.  The bedroom was approximately ten feet by eleven feet and had one window covered in plastic to provide insulation.  *Id.* at 19 – 20.

Stephen had used the space heater in Sawyer's room on previous nights, but the evening of December 15 was colder.  *Id.* at 24.  Before saying good night to Sawyer, Stephen turned on the space heater in the middle of the room.  *Id.* at 23.  Stephen turned on the space heater by rotating the power setting to 1 or 2.  *Id.* at 29.  Stephen turned the thermostat dial of the space heater to mid-range.  *Id.* at 27.  Stephen did not lower the heater's thermostat control after setting it to mid-range.  *Id.* at 27.  Stephen closed the door.  *Id.* at 36.

Alexandria woke several times that night to feed their infant.  Alexandria Scanlan Dep. 58, ECF No. 85-4.  During these night feedings, she listened for Sawyer, who was in the next room, and heard nothing.  *Id.* at 65.  No one else in the house heard noise coming from Sawyer's room.[3]  Around 7:00 the next morning, Alexandria learned that school had been cancelled for Sawyer's older brother due to an ice storm.  Alexandria Scanlan Dep. 65.  She went back to sleep.  *Id.* at 66.

When Alexandria woke around 10:00 that morning, she went to Sawyer's room.  Id. at 66 – 67.  He was unresponsive.  *Id.* at 70 – 71.

An EMS official, Robert Thompson, pronounced Sawyer dead at the scene.  A paramedic on scene, Angele Rarden, noted in her report that the "room was very warm."  Ex. 1 Rarden Dep. 3, ECF No. 93-1.

---

[3] Sawyer's aunt and uncle, Jennifer and Jonathan Vogt, lived with the Scanlans at the time.  A tenant, Joseph Flaksman, lived in the basement.  All three testified that they did not hear noise coming from Sawyer's room that night.  Jennifer Vogt Dep. 60, ECF No. 81-17; Jonathan Vogt Dep. 50, ECF No. 88-15; Joseph Flaksman Dep. 59 – 60, ECF No. 81-16.

By the time law enforcement officials arrived, the space heater was unplugged.  About an hour after they arrived, law enforcement officials checked the temperature of the room, and it was approximately 95 degrees.

The medical examiner performed an autopsy and found Sawyer's physical condition consistent with dehydration.  The medical examiner concluded, "The death of this 2 ½ year-old male child, Sawyer Scanlan, is attributed to heat exposure due to confinement in a small room with an electric space heater."  Autopsy Report 8, ECF No. 52-7.

Before Sawyer's death, Sunbeam did not test how hot the space heater could make a room.  Prins Aug. Dep. 53, ECF No. 91-5.  Throughout this litigation, experts on both sides tested the space heater's ability to heat a room.

On February 28 and 29, 2012, defense expert Robert Miller tested a space heater in Sawyer's room.  It is unclear whether he was testing the space heater that was in Sawyer's room that night or another version of the SFH111.  Miller demonstrated that when the Temperature Control was on Dot 7, at 150 rotational degrees, the space heater ran continuously without cycling off for six hours.  Miller Dep. 71, ECF No. 91-11.  After six hours, the area around Sawyer's crib was almost 110 degrees.  *Id.* at 72.

On October 25, 2012, the parties tested the space heater that had been in Sawyer's room at the law offices of O'Bryan, Brown and Toner in Louisville.  Engineer Craig Clauser's expert report regarding this testing concluded, "It was determined that with the unit set on Heat 2 and Dot 6 position on the Thermostat [Control] the room air was heated to temperatures in excess of 100°F range at locations remote from the direct heater output stream.  The heater never shut off." Clauser Rep. 2, ECF No. 52-4 (brackets added).

5

The space heater's box says it is "best suited for active homes."  Prins Aug. Dep. 273.
The box has two pictures of young children.  Product Packaging 2, ECF No. 91-14.  The box also
says the space heater has an "Auto Shut Off" in which the "unit automatically turns heater off if
it over heats."  *Id.* at 1.

Sunbeam has no record of any complaint "about a personal injury or death resulting from
exposure to heated ambient air from this product model."  Def.'s Resp. Interrog. 21.
Additionally, the space heater "has never been the subject of a recall."  Def.'s Resp. Interrog. 20.

III.     Legal standard

A party moving for summary judgment must show that "there is no genuine dispute as to
any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a).  The Court must determine whether there is a genuine issue for trial.  *Anderson v. Liberty
Lobby*, 477 U.S. 242, 249 (1986).  A genuine issue for trial exists when "there is sufficient
evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.*  "By its
very terms, this standard provides that the mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly supported motion for summary
judgment, the requirement is that there be no *genuine* issue of *material* fact."  *Id.* at 247 – 48.

IV.     Plaintiffs' products liability claim

The crux of this lawsuit is the Plaintiffs' products liability claim.

The Kentucky Product Liability Act governs products liability actions.  *See* Ky. Rev.
Stat. § 411.300 – 350.  Kentucky products liability law centers on the Restatement Second of
Torts § 402A.  *Dealers Transp. Co. v. Battery Distrib. Co.,* 402 S.W.2d 441, 446 – 47 (Ky.
1965).  Section 402A imposes strict liability on a manufacturer "who sells any product in a
defective condition unreasonably dangerous to the user or consumer." Rest. (Second) of Torts
§ 402A.  There are three different causes of action available to a plaintiff: ordinary negligence,

strict liability in tort, and breach of warranty under the Uniform Commercial Code.  *Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530, 535 (Ky. 2003).  Although the negligence and strict liability in tort claims are separate, "When a claim is asserted against a manufacturer for deficient design of its product the distinction between the strict liability principle and negligence is of no practical significance so far as the standard of conduct required of the defendant is concerned."  *Nichols*, 602 S.W.2d at 433.

Kentucky law recognizes three products liability theories: manufacturing defect, design defect, and failure to warn.  *Clark v. Hauck Mfg. Co.*, 910 S.W.2d 247, 251 (Ky. 1995), *overruled on other grounds* by *Martin v. Ohio Cnty. Hosp. Corp.*, 295 S.W.2d 104 (Ky. 2009).  To recover under any products liability theory, the plaintiff must prove a "defect."  *Prather v. Abbott Labs.*, 960 F.Supp.2d 700, 706 (W.D. Ky. 2013).  Products liability actions in Kentucky apply principles of comparative fault.  Ky. Rev. Stat. § 411.182(1); *Caterpillar, Inc. v. Brock*, 915 S.W.2d 751, 753 (Ky. 1996).

The Plaintiffs' products liability claim alleges that the space heater was defective in design because it was capable of heating a room to temperatures "incompatible with human life." *See* Pls.' Resp. Opp. Mot. Summ. J. Prods. Liab. 9, ECF No. 91 ("Pls. Resp. Prods. Liab."). Additionally, the Plaintiffs' products liability claim alleges that the space heater was defective because Sunbeam "did not provide warnings concerning the gravity of harm that could result if the instructions for use were not followed."  *Id.* at 16.

A.  Design defect standard

Under Kentucky law, a product is defective in design when it "creates 'such a risk' of an accident of the general nature of the one in question 'that an ordinary prudent company engaged in the manufacture' of such a product 'would not have put it on the market.'"  *Montgomery Elevator Co. v. McCullough by McCullough*, 676 S.W.2d 776, 780 (Ky. 1984).

7

> Considerations such as feasibility of making a safer product, patency of the danger, warnings and instructions, subsequent maintenance and repair, misuse, and the products' inherently unsafe characteristics, while they have a bearing on the question as to whether the product was manufactured 'in a defective condition unreasonably dangerous' are all factors bearing on the principal question rather than separate legal questions.  In a particular case, as with any question of substantial factor or intervening cause, they may be decisive.

*Id.* at 780 – 81.  Consumer expectations are "only one of the factors that should be before the jury in determining whether a product is unreasonably dangerous."  *Nichols v. Union Underwear Co., Inc.*, 602 S.W.2d 429, 433 (Ky. 1980).

On the other hand, a manufacturer "may present evidence of other manufacturers' designs and how they perform, so that the jury can have a context for evaluating the design of the defendant's product and the reasonableness of the defendant's efforts."  *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 40 (Ky. 2004).

### B.  Application of design defect standard

1.  Whether Sunbeam is entitled to statutory presumption that the space heater was not defective.

Kentucky law presumes that a product was not defective if its design, methods of manufacture, and testing conformed to the generally recognized and prevailing standards.  Ky. Rev. Stat. § 411.310(2).  A plaintiff may rebut this presumption through "evidence that the product was defective," though the plaintiff need not present "evidence that the design did not conform to prevailing standards or was not state of the art at that time."  *Murphy ex rel. Murphy v. Montgomery Elevator Co.*, 957 S.W.2d 297 (Ky. Ct. App. 1997).

Sunbeam argues that it is entitled to the statutory presumption that the space heater was not defective in design because the testing of the space heater conformed to generally recognized and prevailing standards.  *See* Def.'s Mem. Supp. Mot. Summ. J. Prods. Liab. 13, ECF No. 81-1 ("Def.'s Prods. Liab. Mem.").  Specifically, Sunbeam points to the space heater's UL Listing and

Testing file, Quality and Operational testing, and Intertek/ETL testing.  *See* Def.'s Reply Supp. Mot. Summ. J. Prods. Liab. 4, ECF No. 103 ("Def.'s Prods. Liab. Reply").

The Plaintiffs argue that Sunbeam is not entitled to the statutory presumption because Sunbeam "failed to test the physical design of the product," and "failed to perform testing regarding the effect that the design of the [space heater's] packaging would have on consumers." Pls.' Resp. Prods. Liab. 13.

The Plaintiffs acknowledge that the space heater complied with UL Standard for Safety 1278 which provides safety standards for "Movable and Wall or Ceiling Hung Electric Room Heaters."  *Id.* at 5.  Additionally, the Plaintiffs' expert, William Murphy, confirmed that the space heater met or exceeded the requirements of UL 1278.  Murphy Dep. 142, ECF No. 81-10. The Plaintiffs do not dispute Sunbeam's characterization of UL testing as the "nationally recognized standard for portable electric heaters."  *See* Def.'s Mem. Prods. Liab. 4.

UL testing on the space heater included putting a terry cloth towel on the space heater to test whether it shuts off safely on its own.  Vernaglia Dep. 87, ECF No. 87-5.  The UL testing also included putting the space heater next to a wall to test that it shuts off safely.  *Id.*  On the other hand, UL testing does not require a manufacturer to determine the effect of a space heater's output on ambient heated air.  Murphy Aff. ¶ 14, ECF No. 91-13.

The Plaintiffs have not shown that not testing the effect the packaging would have on consumers failed to conform to generally recognized and prevailing standards.  Further, the Plaintiffs have not shown that not testing the space heater's output on ambient heated air failed to conform to generally recognized and prevailing standards.  Thus, there is no genuine issue of material fact regarding whether the space heater conformed to generally recognized and prevailing standards.

The Court concludes that Sunbeam is entitled to the statutory presumption that the space heater was not defective because its testing conformed to generally recognized and prevailing standards.  *See* Ky. Rev. Stat. § 411.310.  Thus, the Plaintiffs may rebut this presumption by showing that the space heater was defective.  *See Murphy*, 957 S.W.2d at 297; *see also*, *Boon Edam, Inc.*, *v. Saunders*, 324 S.W.3d 422, 432 (Ky. Ct. App. 2010).

> 2. <u>Whether the expert testimony shows a genuine issue of material fact as to whether a prudent manufacturer would have placed the space heater on the market</u>

The Plaintiffs argue that the space heater's design is unreasonably dangerous because the space heater can heat a room to temperatures incompatible with human life.  Sunbeam argues that though the space heater can heat a room to very high temperatures, the Plaintiffs have not shown that "'that an ordinary prudent company engaged in the manufacture' of fan heaters 'would not have put it on the market.'" Def.'s Mem. Prods. Liab. 12.   In this section, the Court will discuss the expert testimony on the space heater's design and whether that testimony creates a genuine issue of material fact for whether a prudent manufacturer would have placed this space heater on the market.

Craig Clauser, an engineer with specialties in metallurgical engineering and materials science, testified as an expert for the Plaintiffs.  Dr. Mark Lehto, a professor of engineering at Purdue University, testified as an expert for the Plaintiffs in safety engineering, human factors, and ergonomics.  Dr. William Murphy, a former professor of mechanical engineering at the University of Kentucky, testified as an expert for the Plaintiffs in thermodynamics, heat transfer, and mechanics.  Clauser, Lehto, and Murphy fault the thermostat's temperature range as "unreasonably dangerous" because the space heater can heat a room to an ambient temperature well above the comfort zone (between 65 and 84 degrees) to a range that is dangerous or

"incompatible" with human life.  *See* Clauser Rep. 6; Lehto Rep. 5 – 6, ECF No. 52-1; Murphy Rep. 6, ECF No. 52-2.

Robert Miller, an engineer for Lakewood Engineering and Manufacturing Co., testified as an expert for Sunbeam.  Miller conducted testing of the space heater alongside "five similarly constructed, competitor manufactured 1500 fan heater models also equipped with adjustable comfort thermostats." Miller Aff. ¶ 4.   Miller's testing "confirmed that fan heaters on the market similar in design to the SFH111 are capable of heating environments where [they are] operated to the same temperature levels as the SFH111." *Id.* (brackets added).  Additionally, Miller says,

> The SFH111 is similar in design and construction to competitor manufactured fan heater models on the market.  In that regard, the SFH111 and the majority of other fan heaters on the market are rated 1500 watts, equipped with adjustable comfort thermostats, do not have specific temperatures listed on their thermostat controls and utilize nearly identical safety features.

*Id.* at ¶ 3.

Given this testimony, there is no genuine issue of material fact regarding the space heater's capacity to heat a small room.  The space heater can heat a small room to very high temperatures, above 100 degrees, and 100 degrees is well above the "comfort zone" of sixty-five to eighty-four degrees for normal human activity.  The space heater will heat a small room to very high temperatures, above 100 degrees, if the user turns the Temperature Control to mid-range and does not turn the Temperature Control down.  The space heater may not cycle off on its own until the room temperature exceeds 115 degrees.

The question, however, is whether this capacity to heat a small room to temperatures exceeding 100 degrees makes the space heater "unreasonably dangerous" such that a "prudent manufacturer would not have put it on the market." *McCullough*, 676 S.W.2d at 780.  Certainly, the Plaintiffs present evidence that the space heater can heat a room to very high temperatures, and prolonged stays in high temperatures carry a risk of serious injury or death.

11

On the other hand, the Plaintiffs' experts[4] reached their conclusions that the space heater's capacity to heat a room to high temperatures makes the space heater "unreasonably dangerous" without evaluating the designs of competitive space heaters made by other manufacturers.  Clauser Dep. 36, ECF No. 91-4;  Lehto Dep. 34, ECF No. 91-18; Murphy Dep. 38, ECF No. 93-15.  The Plaintiffs do not rebut Miller's testimony that five fan heaters similar to this space heater have the same capacity to heat a small room to very high temperatures.  Of course, this testimony alone does not conclude the inquiry of whether a prudent manufacturer would have put the space heater on the market, but it does tend to show that a prudent manufacturer may put a space heater with the capacity to heat a room to very high temperatures to market.

3.   Whether the Plaintiffs' proposed alternative design shows a genuine issue of material fact as to whether a prudent manufacturer would have placed the space heater on the market

In support of their contention that the space heater is unreasonably dangerous because it can heat a room to very high temperatures, the Plaintiffs offer an alternative design for the space heater.  Sunbeam argues that though the Plaintiffs may have presented an alternative design of the space heater, the Plaintiffs have not shown "'that an ordinary prudent company engaged in the manufacture' of fan heaters 'would not have put it on the market.'"  Def.'s Mem. Prods. Liab. 12.  In this section, the Court will discuss the Plaintiffs' proposed alternative design and whether it creates a genuine issue of material fact as to whether a prudent manufacturer would have put this space heater on the market.

---

[4] The Plaintiffs also retained Michael Wogalter to evaluate the space heater's design. The Court did not consider his findings on the space heater's design as the magistrate judge already ruled his testimony regarding the design of the space heater inadmissible.  Order 51, ECF No. 110.

To prevail in a design defect case, the plaintiff must present evidence of an "alternative safer design, practicable under the circumstances." *Gregory*, 136 S.W.3d at 41.  The plaintiff "must provide expert testimony establishing 'competent evidence of some practicable, feasible, safer, alternative design.'" *Trent v. Ford Motor Co.*, 2 F.Supp.3d 1022, 1026 (W.D. Ky. 2014) (citing *Gray v. Gen. Motors Corp.*, 133 F.Supp.2d 530, 555 (E.D. Ky. 2001)).

The Plaintiffs present several alternative features of the space heater.

First, the space heater could have used a digital thermostat like Sunbeam's other space heater model, the SFH442.  The SFH442's digital thermostat limits a room's ambient temperature to between sixty and eighty degrees.  Pls.' Resp. Prods. Liab. 12; *see also*, Clauser Rep. 6; Lehto Rep. 7; Murphy Rep. 6 (suggesting replacing analog thermostat with digital thermostat).  Installing a digital thermostat in the space heater would have cost only $1.00 to 1.50 per unit.  *See* Levy Dep. 59, ECF No. 91-24.

Second, the thermostat could have been calibrated to cut off at a temperature lower than 212 degrees.  Pls.' Resp. Prods. Liab. 12 (citing Lozinki Dep. 24, ECF No. 91-25 & Nerkizian Dep. 57, ECF No. 91-20).  Third, the space heater could have used lower wattage.  Pls.' Resp. Prods. Liab. 12 (citing Vernaglia Dep. 226).  Fourth, the packaging could have avoided "misleading" terms like "overheat protection" or "adjustable thermostat."  Pls.' Resp. Prods. Liab. 12 – 13 (citing Lozinski Dep. 35).

As discussed above in Part V(A)(3), Miller's affidavit provides context for whether the space heater's features present an unreasonable risk.  He said, "the majority of other fan heaters on the market are rated 1500 watts, equipped with adjustable comfort thermostats, do not have specific temperatures listed on their thermostat controls and utilize nearly identical safety features" as this space heater.  Miller Aff. ¶ 3.

As a matter of law, however, the Plaintiffs' alternatives are insufficient to establish that the space heater is unreasonably dangerous.  Although the Plaintiffs have offered a reasonable alternative design for the space heater, "proof that technology existed, which if implemented would feasibly have avoided a dangerous condition, does not alone establish a defect." *Stewart v. Gen'l Motors Corp.*, 222 F.Supp.2d 845, 848 (W.D. Ky. 2002) (citing *Brock v. Caterpillar, Inc.*, 94 F.3d 220, 224 (6th Cir. 1996)); *see also*, *Jones v. Hutchinson Mfg., Inc.*, 502 S.W.2d 66, 70 – 71 (Ky. 1973) ("Proof of nothing more than that a particular injury would not have occurred had the product which caused the injury been designed differently is not sufficient to establish a breach of the manufacturer's or sellers' duty as to the design of the product.").

The Plaintiffs' experts reached their conclusions that the space heater's capacity to heat a room to high temperatures makes the space heater "unreasonably dangerous" without evaluating the designs of competitive space heaters made by other manufacturers.  Clauser Dep. 36; Lehto Dep. 34; Murphy Dep. 38.  The Plaintiffs do not rebut Robert Miller's testimony that the majority of space heaters on the market have safety features similar to this space heater.  Given this testimony, there is no genuine issue of material fact regarding the Plaintiffs' proposed alternative design or whether the space heater complied with industry standards.  As discussed above in Part V(A)(2), this testimony alone not conclude the inquiry of whether a prudent manufacturer would have put the space heater on the market, but it does tend to show that a prudent manufacturer may put a space heater on the market with the same features as the SFH111.

4. Whether the design of the space heater was unreasonably dangerous such that a prudent manufacturer would not have put it on the market

The Plaintiffs argue that the space heater is unreasonably dangerous because a reasonable consumer would not have expected that "there was no component of the [space heater] that

14

would shut it off before it heated a room in excess of temperatures incompatible with human life." Pls.' Resp. Prods. Liab. 11. In this section, the Court will discuss consumer expectations about the space heater and whether consumer expectations create a genuine issue of material fact regarding whether a prudent manufacturer would have placed the space heater on the market.

In Kentucky, consumer knowledge of a potential risk is one of many factors that may be considered in determining whether a product is unreasonably dangerous. *See Nichols*, 602 S.W.2d at 433. District courts construing Kentucky law have anticipated that the consumer expectations test does not apply in design defect cases. *See, e.g.*, *Gray*, 133 F.Supp.2d at 535 ("In Kentucky, the consumer expectations test does not apply to design defect cases."); *see also*, *Prather*, 960 F.Supp.2d at 710 n.12 ("The Kentucky Supreme Court renounced the consumer expectations test in favor of the prudent manufacturer test for strict liability, which requires an examination into what the manufacturer knew or should have known at the time its product was sold.").

The Plaintiffs have presented evidence that an ordinary consumer would expect that a space heater would shut off before the ambient temperature in a small room exceeds a temperature compatible with human life. However, under Kentucky law, consumer expectations about a space heater's capabilities are only one of many factors the Court considers in determining whether a space heater is unreasonably dangerous. Consumer expectations alone do not establish a defect. *See Nichols*, 602 S.W.2d at 433 (rejecting jury instruction on design defect which said "A product is 'unreasonably dangerous' only if it is dangerous to an extent beyond that which would be contemplated by an ordinary adult purchaser thereof, with ordinary knowledge as to its inherent characteristics.").

In addition to consumer expectations, the Court considers deviation from industry standard, the obviousness of the danger, and presence of a warning. *Nichols*, 602 S.W.2d at 433. Additional factors the Court considers include "feasibility of making a safer product, patency of the danger, warnings and instructions, subsequent maintenance and repair, misuse, and the products' inherently unsafe characteristics." *McCullough*, 676 S.W.2d at 780 – 81. Subsequent maintenance and repair and misuse are not at issue in this litigation.

The Court has already discussed how the space heater complied with applicable industry standards. *See* discussion *supra* Part IV(B)(1) – (3). The space heater had warnings in the instruction manual which urged "extreme caution" when using the space heater around children, *see* discussion *infra* Part IV(D), though the space heater did not have any warnings regarding the danger posed by ambient heated air. The Plaintiffs have shown that replacing the space heater's analog thermostat with a digital thermostat, along with other alternative features, was theoretically feasible. *See* discussion *supra* Part IV(B)(3).

The Court now turns to the obviousness, or patency, of the danger posed by a space heater and the space heater's inherently unsafe characteristics. Space heaters are designed to heat spaces. To do so, they produce heat. Because they produce heat, they have inherently unsafe characteristics and pose obvious hazards such as shock, burn injury, or fire. The danger posed by a space heater's ability to produce ambient heat derives from the space heater's purpose: to heat a space. Here, this purpose led to a tragic outcome, but it does not make the space heater unreasonably dangerous.

The Plaintiffs must show that the space heater has a defect in order to overcome the statutory presumption that the space heater is not unreasonably dangerous. They have not done so. The Plaintiffs have not rebutted Miller's testimony that this space heater has the same

capacity and features as similar models on the market.  Given the statutory presumption that the space heater is not defective, Miller's testimony, the obviousness of the danger, and the space heater's inherently unsafe characteristics, the Court concludes that the space heater was not unreasonably dangerous such that a prudent manufacturer would not have put it on the market.

Therefore, the Court concludes that Sunbeam is entitled to judgment as a matter of law on the Plaintiffs' strict liability and negligence claims based on a design defect theory.

C. Failure to warn standard

A plaintiff can show that a product is unreasonably dangerous "if it does not adequately warn the consumer that the product should not be put to a certain use." *Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1149 (6th Cir. 1996).  "Under Kentucky law, the duty to warn extends to the dangers likely to result from foreseeable misuse of a product." *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir. 1996).  Or, a plaintiff can show that a manufacturer knew or had reason to know that its product was likely to be dangerous, had no reason to expect the plaintiff would know it, and failed to exercise reasonable care to inform the plaintiff "of its dangerous condition or of the facts which make it likely to be dangerous." *Tipton*, 101 F.3d at 1149 – 50.

D. Application of failure to warn standard

The Plaintiffs argue that the space heater is unreasonably dangerous because "the SFH111's instruction manual contained no warning concerning the SFH111's ability to continuously produce heat on certain settings, excessive ambient temperature, dehydration or hyperthermia." Pls.' Resp. Prods. Liab. 14.  Sunbeam argues that the Plaintiffs could not prove causation under a failure to warn theory because "they do not, and cannot, present any evidence that the inclusion of additional warnings and instructions in different locations on the SFH111 would have changed Stephen Scanlan's behavior when operating the heater at the time of the incident." Def.'s Mem. Prods. Liab. 14.  In this section, the Court will discuss the space heater's

warnings and whether the warnings create a genuine issue of material fact on whether a prudent manufacturer would have put this space heater on the market.

Stephen testified that he may have "glanced over" the instruction manual. Stephen Scanlan Dep. 143. He was unable to recall if he had "fully read" the instructions, but he already "knew how to operate an electric space heater." *Id.*

The Plaintiffs' experts find fault with the warnings provided in the instruction manual, the space heater's box, and the space heater itself. Lehto, Murphy, and Wogalter fault the instruction manual because it does not warn the consumer about the space heater's capacity to heat a room to very high temperatures. *See* Lehto Rep. 8, Murphy Rep. 5, and Wogalter Rep. 14, ECF No. 52-3. All of the Plaintiffs' experts fault the space heater's box for using the terms "adjustable thermostat" and "overheat protection." Clauser Rep. 5; Lehto Rep. 7; Murphy Rep. 5; Wogalter Rep 7. Clauser, Murphy, and Wogalter fault the space heater itself for not having a warning that the space heater could produce very high temperatures. Clauser Rep. 7; Murphy Rep. 5; Wogalter Rep. 13. Additionally, Clauser, Lehto, and Wogalter fault the Thermostat Control on the space heater because its picture of a thermometer could lead a consumer to believe that the dots correspond to actual room temperatures. Clauser Rep. 5; Lehto Rep. 7; Wogalter Rep. 6. However, the Plaintiffs' experts all testified that they did not review the warnings provided with a competitor space heater. Clauser Dep. 41 – 42; Lehto Dep. 60 – 61; Murphy Dep. 38; Wolgater Dep. 106, ECF No. 91-1.

Miller, Sunbeam's expert, also evaluated the space heater's warnings. Miller said,

The SFH111 and other fan heaters on the market contain nearly identical instructions and warnings. In this case, I reviewed the warnings and instructions accompanying the SFH111 and multiple similarly constructed, competitor manufactured 1500 watt fan heater models also equipped with adjustable comfort thermostats. This review confirmed that fan heaters on the market similar in design to the SFH111 contain nearly identical warnings and instructions regarding

18

> heater use and adjustable thermostat operation.  None of the heaters I evaluated contained a warning concerning the potential for the product to produce elevated ambient temperatures during use or a warning regarding the dangers associated with raised temperature levels.

Aff. Miller ¶ 5.

The Plaintiffs argue that Sunbeam cannot avoid liability for failure to warn based on Stephen's failure to follow the space heater's operating instructions.  Pls.' Resp. Prods. Liab. 15 (citing *Post v. American Cleaning Equip. Co.*, 437 S.W.2d 516, 517 – 21 (Ky. 1968)).  In *Post*, Kentucky's highest court held that it was a jury question as to whether a manufacturer was liable for failure to warn when it did not provide warnings concerning the gravity of harm that could result if the instructions were not followed, and the manufacturer could reasonably see misuse of its product. *See id.* at 517 – 21.

However, Sunbeam replies that *Post* does not apply because the duty to warn applies only to inherent dangers known to the manufacturer, and "this lawsuit is the first and only claim or lawsuit Sunbeam has ever received involving an alleged personal injury or death resulting from exposure to heated ambient air."  Def.'s Reply Prods. Liab. 7.  Further, Miller's testimony indicates that other space heater manufacturers also do not warn consumers of the risk of personal injury or death from ambient heated air.

The Court agrees with Sunbeam.  The Plaintiffs have not shown that Stephen would have behaved differently if the instruction manual, the space heater's box, or the space heater itself had a warning regarding the space heater's ability to heat a room to very high temperatures. While the terms "adjustable thermostat" and "overheat protection" may be simplistic in describing the space heater's features, the Plaintiffs have not shown that Stephen relied on those features when he turned on the space heater that night.  The instruction manual said to use "extreme caution" when operating the space heater around children.  The Plaintiffs' experts all

testified that if Stephen had followed the instruction manual and turned down the Thermostat Control after the room reached a comfortable temperature, Sawyer likely would have survived. Clauser Dep. 51; Lehto Dep. 159; Murphy Dep. 87; Wogalter Dep. 104.

Therefore, the Court concludes that Sunbeam is entitled to judgment as a matter of law on the Plaintiffs' strict liability in tort and negligence claims based on a failure-to-warn theory.

### E. Breach of warranty

Count IV of the Plaintiffs' complaint alleges breach of warranty. The complaint reads,

> Defendant, Sunbeam Products Inc. d/b/a Jarden Consumer Solutions, warranted, including but not limited to express warranty, implied warranty of merchantability, implied warranty of fitness for a particular purpose, that at the time of manufacture, construction, design, formulation, development of standards, preparation, processing, assembling, testing, listing, certifying, warning, constructing, marketing, advertising, selling, distributing, packaging, labeling, importing, and selling that the subject product was of good and merchantable quality and was fit for its particular or intended purpose or use.

Am. Compl. ¶ 33, ECF No. 45.

Sunbeam moves for summary judgment on the Plaintiffs' breach of warranty claim. Sunbeam makes no argument regarding this claim, but instead casually incorporates "breach of warranty" in the products liability claim analysis. *See, e.g.*, Def.'s Mem. Prods. Liab. 15 ("Moreover, they offer no expert testimony or other evidence of a causal manufacturing defect. As such, their strict liability, negligence, and breach of warranty causes of action are fatally flawed and summary judgment is proper.").

Strict liability in tort, negligence, and breach of warranty claims all require the plaintiff to prove that a product has a defect or is unreasonably dangerous. *Prather*, 960 F.Supp.2d at 715. In *Prather*, the district court granted summary judgment to a manufacturer on a breach of warranty claim even though the parties did not brief the issue. *Id.*

20

Here, the Court's previous findings that the space heater was not unreasonably dangerous, and that the Plaintiffs cannot sufficiently demonstrate legal causation, foreclose the Plaintiffs' ability to prove a meritorious warranty claim. *See id*.

Accordingly, the Court will grant summary judgment to Sunbeam on the Plaintiffs' breach of warranty claim.

V.    <u>Plaintiffs' statutory claims</u>

    A.  <u>Kentucky Consumer Protection Act claim</u>

Count V of the Plaintiffs' amended complaint alleges that Sunbeam violated the Kentucky Consumer Protection Act by "engaging in unfair, false, misleading, or deceptive acts or practices in the conduct of its trade or commerce." Am. Compl. ¶ 38.

Sunbeam argues that the "Plaintiffs' generic allegations are insufficient to survive summary judgment." Def.'s Mem. Prods. Liab. 15. The Court agrees.

The Court has reviewed the substantial record in this case. Here, as in *Dalton*, the Plaintiffs have not alleged facts upon which a reasonable jury could find Sunbeam intentionally, knowingly, or in bad faith took malign actions affecting the Plaintiffs. *See Dalton v. Animas Corp.*, 913 F.Supp. 2d 370, 378 (W.D. Ky. 2013).

The Court will grant summary judgment to Sunbeam on the Plaintiffs' Kentucky Consumer Protection Act claim.

    B.  <u>Magnuson-Moss Warranty Act claim</u>

Count V of the Plaintiffs' amended complaint alleges that Sunbeam violated the Magnuson-Moss Warranty Act "by engaging in unfair, false, misleading, or deceptive acts or practices in the conduct of its trade or commerce." Am. Compl. ¶ 38.

Sunbeam argues that "an action under the Magnuson-Moss Warranty Act cannot be maintained where there is not a viable a state law breach of warranty claim."  Def.'s Mem. Prods. Liab. 16.  The Court agrees.

An action under the Magnuson-Moss Warranty Act can only be maintained with a viable state law breach of warranty claim.  *Levin v. Trex Co.*, 2012 WL 7832713 *1, *4 (W.D. Ky. Mar. 5, 2012).  The Court has already held that the Plaintiffs' warranty claim fails as a matter of law. *See* discussion *supra* Part V(A).  Therefore, the Plaintiffs' Magnuson-Moss Warranty Act claim also fails as a matter of law.

The Court will grant summary judgment to Sunbeam on the Plaintiffs' Magnuson-Moss Warranty Act claim.

VI.     Survival and punitive damages

A.   Plaintiffs' claim for survival damages

Sunbeam also moves for summary judgment on the Plaintiffs' claim for survival damages.  Def.'s Mem. Supp. Mot. Summ. J. Survival Damages 1, ECF No. 83-1.

Having held that the Plaintiffs' products liability claims fail as a matter of law, *see* discussion *supra* Parts IV & V, the Plaintiffs cannot recover damages.

The Court will grant summary judgment to Sunbeam on the Plaintiffs' survival damages claim.

B.   Plaintiffs' claim for punitive damages

Sunbeam also moves for summary judgment on the Plaintiffs' claim for punitive damages.  Def.'s Mem. Supp. Mot. Summ. J. Punitive Damages 1, ECF No. 84-1.

Having held that the Plaintiffs' products liability claims fail as a matter of law, *see* discussion *supra* Parts IV & V, the Plaintiffs cannot recover punitive damages.

The Court will grant summary judgment to Sunbeam on the Plaintiffs' punitive damages claim.

VII.    Plaintiffs' claim for negligent infliction of emotional distress

Sunbeam also moves for summary judgment on the Plaintiffs' negligent infliction of emotional distress claim.  Def.'s Mem. Supp. Mot. Summ. J. NIED 1, ECF No. 82-1 ("Def.'s Mem. NIED").  The Plaintiffs did not file a response to this motion.

Regardless of whether a non-movant responds, a summary judgment movant "always bears the burden of demonstrating the absence of a genuine issue of material fact."  *Carver v. Bunch*, 946 F.3d 451, 454 (6th Cir. 1991).  Additionally,

> More importantly, for all purposes, the movant must always bear this initial burden regardless if an adverse party fails to respond.  In other words, a district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded.  The court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged that burden.

*Id.* at 454 – 55 (internal citations omitted).  Still, the Court has no "duty to sift through the record in search of evidence to support a party's opposition to summary judgment."  *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007).

Under Kentucky law, a plaintiff alleging negligent infliction of emotional distress must present evidence that "(1) the defendant owed a duty of care to the plaintiff; (2) breach of that duty; injury to the plaintiff; and (4) legal causation between the defendant's breach and the plaintiff's injury."  *Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012). A plaintiff can only recover for severe or serious emotional injury:

> A 'serious' or 'severe' emotional injury occurs where a reasonable person, normally constituted, would not be expected to endure the mental stress engendered by the circumstances of the case.  Distress that does not significantly affect the [plaintiff's] everyday life or require significant treatment will not suffice.  And a plaintiff claiming emotional distress damages *must present expert medical or scientific proof* to support the claimed injury or impairment.

*Id.* at 17 – 18 (emphasis added).

Sunbeam argues that the Plaintiffs' NIED claim fails as a matter of law because the Plaintiffs have not presented expert medical or scientific proof of severe or serious emotional injury. Def.'s Mem. NIED 2. Sunbeam argues, "It is undisputed that Plaintiffs have not presented the expert testimony required to support their claimed emotional distress damages." *Id.* at 6. After reviewing the Plaintiffs' expert witness disclosures, the Court agrees.

The Plaintiffs identified seven experts. Pls.' Expert Disclosures 1 – 2, ECF No. 52. Of those seven, Mark Lehto, Michael Wogalter, Craig Clauser, and William Murphy are engineers. Order 1 – 2 (Sept. 1, 2015), ECF No. 110; Pls.' Ex. 4, ECF No. 52-4. Sara Ford is a vocational economic analyst. Order 2 (Sept. 1, 2015). Only two of the experts, Dr. George Nichols and Dr. Michael Johnson, appear to have any scientific or medical training in mental health, but their reports concern Sawyer's cause of death, not the Plaintiffs' alleged emotional injury. Nichols Rep. 5, ECF No. 52-5; Autopsy Rep. 8. Without any expert medical or scientific proof to support a claim for negligent infliction of emotional distress, the Plaintiffs' NIED claim fails as a matter of law under *Osborne*.

The Court will grant summary judgment to Sunbeam on the Plaintiffs' NIED claim.

VIII.   Conclusion

The Court will grant summary judgment to Sunbeam on the Plaintiffs' strict liability in tort, negligence, breach of warranty, Kentucky Consumer Protection Act and Magnuson-Moss Warranty Act claims.

The Court will grant summary judgment to Sunbeam on the Plaintiffs' claim for survival damages. The Court will grant summary judgment to Sunbeam on the Plaintiffs' claim for punitive damages.

The Court will grant summary judgment to Sunbeam on the Plaintiffs' claim for negligent infliction of emotional distress.

The Court will dismiss the Plaintiffs' claim against Sunbeam, with prejudice.

The Court will enter an order in accordance with this opinion.

February 19, 2016

**Charles R. Simpson III, Senior Judge**
**United States District Court**

25