UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

STEPHEN AND ALEXANDRIA SCANLAN,
INDIVIDUALLY AND AS ADMINISTRATORS
OF THE ESTATE OF SAWYER SCANLAN                                    PLAINTIFFS


v.                                                CIVIL ACTION NO. 3:12-CV-00009-CRS


SUNBEAM PRODUCTS, INC. D/B/A
JARDEN CONSUMER SOLUTIONS                                            DEFENDANT


**MEMORANDUM OPINION**

I.  Introduction

This case is before the court on Defendant Sunbeam Products, Inc. d/b/a Jarden Consumer Solutions' (hereinafter "Sunbeam") motion for summary judgment on Plaintiffs Stephen and Alexandria Scanlan's (collectively "the Scanlans") claims for survival and punitive damages. ECF Nos. 83 and 84. The Scanlans responded. ECF Nos. 93 and 95. Sunbeam subsequently replied. ECF Nos. 104 and 105. Based on the Sixth Circuit Court of Appeals' decision in this case, Sunbeam also moves for leave to supplement its motion for summary judgment on the Scanlans' claim for punitive damages. ECF No. 126. The Scanlans responded. ECF No. 131. These matters are now ripe for review. For the reasons set forth below, Sunbeam's motion for summary judgment on the Scanlans' claim for survival damages will be denied. Sunbeam's motion for leave to supplement, as well as its motion for summary judgment on the Scanlans' claim for punitive damages, will be granted.

1

## II. Factual Background

The facts of this case have previously been detailed by this court.

This case arises from the tragic death of two-year-old Sawyer Scanlan from heatstroke. On December 15, 2010, Stephen Scanlan put his son, Sawyer, to bed in his crib at approximately 9:00 p.m. ECF No. 88-3, p. 7. Stephen turned on the Sunbeam Fan-Forced Heater, Model No. SFH111 ("space heater" or "SFH111") and turned the thermostat dial to mid-range. *Id.* at 23. He then left the room and shut the door behind him. *Id.* at 36. Although Sawyer's mother, Alexandria Scanlan, woke up several times during the night to feed Sawyer's infant sister, she did not check on Sawyer because she did not hear any noise coming from his room and assumed he was sleeping. ECF No. 85-4, p. 58.

At approximately 10:00 a.m. the following morning, Alexandria went to Sawyer's room to wake him. *Id.* at 66-67. When she opened the bedroom door, she felt a burst of hot air and found Sawyer lying in his crib, unresponsive. *Id.* at 70-71. An EMS official pronounced Sawyer dead at the scene. The medical examiner concluded that "The death of this 2 ½ year-old male child . . . is attributed to heat exposure due to confinement in a small room with an electric space heater." ECF No. 52-7. (ECF No. 135).

In December 2011, the Scanlans filed suit against Sunbeam, stating claims for strict liability, negligence, breach of warranty, violations of the Kentucky Consumer Protection Act (KCPA) and the Magnuson-Moss Warranty Act, survival damages, and punitive damages. ECF No. 1-1. Sunbeam moved for summary judgment on all claims. ECF Nos. 81-84. This court granted Sunbeam's motions for summary judgment on the Scanlans' substantive claims, rendering the claims for survival and punitive damages moot. ECF No. 113. The Scanlans subsequently appealed this decision to the Sixth Circuit, which affirmed the summary judgment ruling for the KCPA claim, and reversed the ruling for the strict liability, negligence, breach of warranty, and Moss-Magnuson Warranty Act claims. ECF No. 119. Thus, the Scanlans' claims for survival and punitive damages are again at issue.

III. Legal Standard

The trial court shall grant summary judgment in a case "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of "demonstrating that [there is] no genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies this burden, the burden then shifts to the nonmoving party to "point to evidence demonstrating that there *is* a genuine issue of material fact for trial." *Id.* at 323 (emphasis added).

In considering a motion for summary judgment, the court must consider the facts in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There must actually be "evidence on which the jury could reasonably find for the [nonmoving] party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

IV. Discussion

Sunbeam moves for summary judgment on the Scanlans' claims for survival damages and punitive damages. These motions will be considered in further detail below.

A. Motion for Summary Judgment as to the Scanlans' Claim for Survival Damages

Sunbeam moves for summary judgment on the Scanlans' claim for survival damages. According to Sunbeam, the Scanlans present no evidence that the decedent, Sawyer Scanlan, experienced conscious pain and suffering prior to his death—a requisite for survival damages.

Taking the facts in the light most favorable to the Scanlans, the court finds that there is a genuine issue of material fact that precludes summary judgment.

Under Kentucky law, a plaintiff may not recover survival damages—also known as pain and suffering damages—"if [the decedent] was unconscious from the time of the [injury] until [his] death." *Vitale v. Henchey*, 24 S.W.3d 651, 659 (Ky. 2000). Survival damages "may be awarded, however, if the injured person was partly conscious, had intervals of consciousness, or was conscious for a short time before death." *Id.* (citations omitted). "While Kentucky courts have not required evidence showing the precise amount of time that a decedent survived an injury-causing incident or how long the decedent was conscious, there must be some evidence of conscious survival." *Hengel v. Buffalo Wild Wings, Inc.*, 2013 WL 3970154, *2 (E.D. Ky. July 31, 2013).

Sawyer Scanlan's cause of death is listed as "heat exposure due to confinement in a small room with an electric space heater." ECF No. 95-7, p. 8. Dr. Janice Ophoven, a forensic pathologist, describes the sequence of physiological responses a person experiences when exposed to excessive heat. EFC No. 95-6. She states:

> [W]hen the hypothalamus doesn't have the reserve or the ability to maintain homeostasis, the core temperature begins to rise . . . The pulse goes up, the body shunts blood to the skin so that there's flushing and ideally increased ability for temperature or heat losses in the skin. And then when the system fails, the brain, it basically moves, very, very quickly. There's the onset of brain swelling, seizures, vomiting perhaps, diarrhea perhaps, loss of consciousness, and death. *Id.* at 86-87.

When Sawyer was discovered deceased on the morning of December 16, 2010, the conditions of his body were consistent with Dr. Ophoven's description. Angela Rarden, the EMT who responded to the Scanlan household, stated that Sawyer's "hair and clothing were damp like he had been sweating or wet . . ." ECF No. 95-11, p. 24. The post-mortem report further states

that there was "dried vomitus . . . around the collar of [Sawyer's] shirt" and "copious fecal matter within [his] diaper." ECF No. 95-7, p. 1.

Sunbeam attempts to analogize the facts of this case to *Hengel v. Buffalo Wild Wings, Inc. et al.*, 2013 WL 3970154 (E.D. Ky. July 31, 2013). In *Hengel*, the decedent died after his car was hit by a train at a railroad crossing. *Id.* Because the decedent did not receive any medical treatment before his death and there was no evidence that he survived the impact of the crash, the court found that there was insufficient evidence for a jury to conclude that the decedent consciously suffered prior to his death. *Id.* at *3. Sunbeam contends that the Scanlans likewise fail to show that Sawyer consciously suffered before his death, as none of the adults in the house heard any noises from Sawyer's room on the night of his death, and Sawyer was pronounced dead by EMTs at the scene.

This case is distinguishable from *Hengel*. While the evidence in *Hengel* suggests that the decedent could have died on impact, it is undisputed that Sawyer was conscious when he was put to bed with the space heater running. Indeed, Stephen Scanlan testified that Sawyer "blew [him] a kiss as [he] walked out of the room." ECF No. 93-2, p. 3. Moreover, Dr. Ophoven's testimony suggests that a person loses consciousness from excessive heat exposure only after progressing through a series of other physiological symptoms. Based on this evidence, a reasonable jury could conclude that Sawyer was conscious as he experienced increased heart rate, sweating, brain swelling, and vomiting. Therefore, Sunbeam's motion for summary judgment as to the claim for survival damages will be denied.

B. <u>Motion for Summary Judgment as to the Scanlans' Claim for Punitive Damages</u>

Additionally, Sunbeam moves for summary judgment on the Scanlans' claim for punitive damages. Based on the Sixth Circuit's opinion in this case, Sunbeam further moves for leave to supplement its motion.

As an initial matter, the court will consider Sunbeam's motion for leave to supplement its motion for summary judgment on the claim for punitive damages. Whether to grant or deny a motion for leave to supplement is within the court's discretion to manage its docket. *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996). Because the Scanlans have had the opportunity to respond to Sunbeam's argument, and because the court seeks to consider all relevant information pertaining to the issue of punitive damages, this motion will be granted.

Sunbeam contends that it is entitled to summary judgment on the claim for punitive damages because the Scanlans fail to demonstrate that it acted with malice, gross negligence, or reckless disregard for human life. Moreover, Sunbeam notes that the Sixth Circuit previously concluded that "there is no evidence in the record from which a jury could find that [Sunbeam] consciously disregarded known hazards associated with the SFH-111's heating capabilities."[1] ECF No. 119, p. 26. Taking the facts in the light most favorable to the Scanlans, the court agrees with Sunbeam.

Under Kentucky law, punitive damages may be awarded when a plaintiff proves "by clear and convincing evidence that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud, or malice." KRS 411.184(2). Additionally, the

---

[1] The Sixth Circuit made this finding in affirming this court's decision to grant summary judgment on the Scanlans' claim for violation of the KCPA. Although this finding is not dispositive as to the claim for punitive damages, it supports the conclusion that Sunbeam's actions did not constitute gross negligence or reckless indifference to the safety of consumers.

6

Kentucky Supreme Court has held that punitive damages may be awarded for gross negligence, which is defined as "wanton or reckless indifference to the rights of others." *Williams v. Wilson*, 972 S.W.2d 260, 261 (Ky. 1998). In the product liability context, punitive damages may be awarded when the plaintiff shows (1) an injury-causing defect, and (2) that "something about the defendant's conduct was outrageous, was at least grossly negligent, or amounted to reckless indifference." *Sufix U.S.A., Inc. v. Cook*, 128 S.W.3d 838, 841 (Ky. Ct. App. 2004).

There is insufficient evidence that Sunbeam's design, manufacturing, testing, or warning for the SFH-111 was outrageous, grossly negligent, or amounted to reckless indifference. In support of their request for punitive damages, the Scanlans first assert that Sunbeam failed to test the physical design of the SFH-111. ECF No. 93, p. 7. The Scanlans analogize the facts of this case to those of *Sufix U.S.A., Inc. v. Cook*, 128 S.W.3d 838. In *Sufix*, the plaintiff was injured when the plastic cap on the weed trimmer he was using disintegrated and one of the metal blades hit his leg. *Id.* The manufacturer of the weed trimmer could not document *any* expert testing conducted on the weed trimmer. *Id.* at 841. The manufacturer also sold a sturdier, metal-capped version of the same weed trimmer in Italy after the country rejected the cheaper, plastic-capped version. *Id.* Moreover, even after receiving complaints from consumers that the plastic-capped weed trimmer was disintegrating during use, the manufacturer still did not make changes to the weed trimmer's design or pull the product off the market. *Id*.

Sunbeam, by contrast, *did* conduct testing on the physical design of the SFH-111. The SFH-111 underwent "quality and operational testing during the design and manufacturing stages of its development so it would operate safely and effectively." Pl.'s Interrogatories, ECF No. 84-7, p. 4. This included testing the space heater's power input, voltage limit, and leakage current. ECF No. 93-25, pp. 115-16. A 'terry cloth drape test' was also performed to ensure that the

7

space heater would turn off if it came into contact with a flammable material. *Id.* at 116. Importantly, the SFH-111 is Underwriters Laboratories ("UL") listed, meaning that it complies with a nationally-recognized safety standard for consumer use of portable space heaters. ECF No. 93-25, p. 114. This fact weighs against awarding punitive damages in a design defect case. *Cameron v. DaimlerChrysler Corp.*, 2005 WL 2674990, *9 (E.D. Ky. Oct. 20, 2005) (citing *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 893 (2000)).

It is true that Sunbeam did not conduct ambient temperature testing on the SFH-111 to measure its heating capability in a small room. However, unlike the facts of *Sufix*, there is no evidence that Sunbeam was put on notice that the SFH-111's heating capabilities posed a risk of personal injury or death. While the Scanlans claim that Sunbeam's failure to conduct this type of testing deviated from industry practice, they provide no evidence to support this assertion.

The Scanlans next contend that punitive damages are appropriate in this case because Sunbeam put its own financial interests ahead of the safety of consumers. They point to the fact that "the SFH-111's near-identical sister product, the SFH-442, contained a digital thermostat that could limit a room's ambient temperature to between 60 [and] 80 degrees," and that it would have only cost Sunbeam "$1.00 to $1.50 more per unit" to put this thermostat in the SFH-111. ECF No. 93, p. 9. They also claim that "the SFH-111's design was determined by the marketing department, which did not employ any engineers." *Id.*

The Scanlans again assert that Sunbeam's actions are analogous to the manufacturer in *Sufix* that sold the cheaper, plastic-capped version of the weed trimmer in the United States, while selling the more expensive, metal-capped version in Italy. However, the manufacturer's sale of an identical product without the defect was but one factor the court considered in allowing for punitive damages. As previously stated, there was also evidence that the

manufacturer failed to perform sufficient product testing, and that the manufacturer was made aware of the safety risks posed by the cheaper product. By contrast, Sunbeam simply made a marketing decision to sell the more expensive SFH-442 with a digital thermostat, as well as the less expensive SFH-111 model. This is more similar to the facts of *Logan v. Cooper Tire & Rubber Co.*, 2011 WL 2453491 (E.D. Ky. June 10, 2011), where the court found that although another product design without the defect existed, the manufacturer's design complied with industry safety standards, and therefore punitive damages were not warranted.

Furthermore, the Scanlans' assertion that the marketing department—rather than engineers—designed the SFH-111 is unfounded. Richard Prins, a Sunbeam senior director product safety engineer, specifically stated in his deposition that the SFH-111 was designed by engineers at Holmes, Sunbeam's predecessor. ECF No. 93-8, pp. 148-49.

Finally, the Scanlans claim that they are entitled to punitive damages against Sunbeam because Sunbeam consciously disregarded the hazards created by the SFH-111. The Scanlans assert that Sunbeam knew the SFH-111 could heat a room to 140 degrees, but did nothing to guard against this hazard. While Sunbeam may have been aware of this fact, there is insufficient evidence to demonstrate that Sunbeam knew the SFH-111's heating capabilities posed a risk of personal injury or death. Although Sunbeam sold over four million SFH-111 space heaters, it never received a complaint or was subject to a lawsuit relating to personal injuries or death from excessive heat exposure prior to this case. ECF No. 84-19. Based on these facts, there is insufficient evidence that Sunbeam's design, manufacture, testing, or warning for the SFH-111 was outrageous, grossly negligent, or amounted to reckless indifference for the safety of others. Sunbeam is entitled to summary judgment on the claim for punitive damages.

V.   <u>Conclusion</u>

For the foregoing reasons, Sunbeam's motion for summary judgment on the Scanlans' claim for survival damages will be denied. Sunbeam's motion for leave to supplement its motion for summary judgment, as well as its motion for summary judgment on the Scanlans' claim for punitive damages, will be granted. An order will be entered in accordance with this memorandum.

May 24, 2018

**Charles R. Simpson III, Senior Judge
United States District Court**